UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------x
MARK WEXELBERG,

                :

       Plaintiff,              REPORT & RECOMMENDATION

                :

       -against-             13 Civ. 7904 (LAK)(MHD)

                :

PROJECT BROKERS LLC, CHARLES
RADCLYFFE and MISHA WILLIAMS,   :

       Defendants.      :
--------------------------------x

TO THE HONORABLE LEWIS A. KAPLAN,
UNITED STATES DISTRICT JUDGE:

     Plaintiff Mark Wexelberg has filed this disability-discrimination suit against his former employer, Project Brokers, LLC, and his former supervisors Charles Radclyffe and Misha Williams. He alleges that defendants discriminated against him on the basis of his physical disability, failed to follow through on a promised reasonable accommodation, and terminated him when he complained about the discrimination and failure to accommodate him. He therefore asserts claims of discrimination and retaliation under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112 et seq.; the New York State Human Rights Law ("NYSHRL"), N.Y. Executive Law §§ 296(6) & (7)); and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107(7), as well as a claim for aiding and abetting discrimination under the NYSHRL.

Prior to the start of pre-trial discovery, defendants have moved to dismiss all claims for lack of subject-matter jurisdiction and failure to state a claim, or, in the alternative, for summary judgment. For the reasons that follow, we recommend that the motion be denied.

## I.   <u>Facts as Alleged in the Amended Complaint</u>

Plaintiff is a domiciliary of Colorado. (Am. Compl. ¶ 2). He alleges that defendant Project Brokers LLC has its principal place of business in London, United Kingdom, and operates an office in New York City. (<u>Id.</u> at ¶¶ 4-5). According to plaintiff, Project Brokers operates as an integrated business in several countries, including the United States and the United Kingdom. (<u>Id.</u> at ¶ 7). He further asserts that Project Brokers "had 15 or more employees across all offices working each day during 20 or more calendar weeks in 2010 and 2011." (<u>Id.</u> at ¶ 8).

According to plaintiff, during the relevant time period, defendant Charles Radclyffe ("Radclyffe"), a domiciliary of the United Kingdom, was Project Brokers' Chief Executive Officer. (<u>Id.</u> at ¶ 9). Defendant Misha Williams ("Williams") was plaintiff's

2

immediate supervisor while he was employed at Project Brokers' New
York office and is a domiciliary of Texas. (Id. at ¶¶ 10-11).

Plaintiff avers that, prior to being hired, he engaged in
lengthy negotiations with Project Brokers management, specifically
defendant Radclyffe, regarding the terms of his prospective
employment. (Id. at ¶¶ 15, 19-21). During these negotiations, he
informed defendants that he suffers from a physical disability that
hinders his ability to travel -- that is, he has several titanium
rods and plates in his legs as a result of a motorcycle accident,
and these limit his physical mobility and endurance. (Id. at ¶¶ 16-
17). Plaintiff alleges that he informed defendants that if he
accepted a position with Project Brokers, he could only work with
clients located within New York City, and that Project Brokers
would need to absorb the extra travel costs necessitated by his
condition. (Id. at ¶¶ 18-19). According to plaintiff, Radclyffe
informed him by e-mail that the Chief Financial Officer of Project
Brokers had approved these accommodations, and "that Project
Brokers would be happy to cover [plaintiff's] travel costs." (Id.
at ¶¶ 20-21).

Plaintiff reports that, in reliance on this representation, he
declined "a number of other lucrative opportunities", and relocated

3

with his family from Colorado to New Jersey. (Id. at ¶¶ 22-23). He joined Project Brokers as a Qlikview ("QV") Consultant in the New York City office, beginning on August 1, 2011, at an annual salary of $115,000. (Id. at ¶¶ 1, 24). On that same day, plaintiff alleges, Williams informed him that he was being assigned to a client in Stamford, Connecticut. (Id. at ¶ 25). Plaintiff expressed his concerns about this assignment to Williams and informed him of the assurances made by Radclyffe regarding the cost and extent of travel. (Id. at ¶ 26). Plaintiff alleges that he regularly submitted travel expense forms to Williams and had multiple disagreements with him regarding reimbursement, including an incident in which Williams informed plaintiff that "reimbursement of travel expenses was not a regular occurrence within Project Brokers" and that Williams would need to check with Radclyffe before authorizing any reimbursement. (Id. at ¶¶ 27-28). According to plaintiff, despite prior assurances, he was not reimbursed for his travel expenses during his tenure at Project Brokers. (Id. at ¶ 30).[1]

---

[1] In plaintiff's declaration in opposition to defendants' motion he mentions that he finally was paid for his travel expenses at the time of his termination. (Decl. of Mark Wexelberg, dated Jan. 14, 2014 (Dkt. No. 18-4) ("Wexelberg Decl.") at ¶ 46).

4

On October 17, 2011, less than three months after being hired, plaintiff was terminated by Project Brokers. (Am. Compl. ¶ 31). According to plaintiff, Williams informed him that his termination was based on two reasons: (1) a client had expressed dissatisfaction with his performance, and (2) a recent assessment performed by Project Brokers indicated that he did not meet the standards of a QV Consultant. (Id. at ¶ 32). Prior to this date, plaintiff claims, defendants had never expressed any dissatisfaction with his job performance. (Id. at ¶ 33). Moreover, plaintiff alleges that Williams had earlier told him that he did not need to complete the mandatory induction training sessions normally required of QV Consultants -- despite the fact that plaintiff requested this training -- because "someone of his experience would have gained a minimal benefit from participating in such sessions." (Id. at ¶¶ 34-35).

Plaintiff alleges that Williams "repeatedly and consistently" discriminated against him on the basis of his disability. (Id. at ¶ 37). He also alleges that he was terminated in retaliation for objecting to defendants' failure to reasonably accommodate his disability, and that the reasons provided by defendants for his termination were pretextual. (Id. at ¶ 38). He filed a discrimination charge against Project Brokers with the Equal

5

Opportunity Employment Commission on June 18, 2012, and was notified on August 29, 2013 of his right to sue. (Id. at ¶¶ 39-40).

## II. **Defendants' Motion**

Defendants' motion targets all four of plaintiff's claims. They attack the adequacy of the complaint to allege certain assertedly required elements under both the ADA and the equivalent State and City statutory provisions, and they also proffer some evidence to support their alternative argument that -- pleading adequacy aside -- as a matter of law plaintiff cannot satisfy the cited statutory requirements.

In defendants' initial papers, they argue for dismissal of the ADA claim on the basis that plaintiff fails to adequately plead, and cannot prove, that defendant Project Brokers LLC employed at least fifteen individuals who worked at least twenty weeks in 2010 or 2011. Invoking this statutory requirement found at 42 U.S.C. § 12111(5)(A)[2], they press two arguments. First, although plaintiff alleges that defendant "Project Broker's New York office operates

---

[2]The cited provision specifies that the ADA applies to employers that have "15 or more employees for each working day of 20 or more calendar weeks in the current or preceding calendar year."

6

as part of an integrated enterprise, in association with other offices located in the United Kingdom, South Africa, France, Dubai and Abu Dhabi" and that the integrated enterprise had the requisite "15 or more employees across all offices" (Am. Compl. ¶¶ 7-8), defendants argue that these allegations do not satisfy plaintiff's pleading burden. (Defs.' Mem. of L. in Supp. of Mot. to Dismiss, dated Dec. 16, 2013 (Dkt. No. 12) ("Defs.' Mem.") at 6-7). Second, defendants proffer a declaration by defendant Radclyffe in which he asserts, in substance, that Project Brokers Ltd. (a United Kindom entity now known as BIPD Ltd.) was merely the parent of defendant Project Brokers LLC (Decl. of Charles Radclyffe, dated Nov. 30, 2013 (Dkt. No. 11) ("Radclyffe Decl.") at ¶ 3), and on this basis they argue that it should not be deemed, in combination with the American subsidiary, to be a "single employer" of plaintiff. (Defs.' Mem. 7). According to defendants, rejection of such single-employer status would be the death knell for plaintiff's ADA claim because the American entity -- assertedly a New Jersey corporation with a New York headquarters -- had only four, and then seven, employees for the required twenty weeks during the relevant years. (Radclyffe Decl. ¶ 4 & Exs. B-C; Defs.' Mem. 7).

As for plaintiff's State and City claims, defendants seek dismissal or summary judgment premised on the notion that plaintiff

7

has not pled, and cannot prove, that the alleged wrongful conduct
had some required "impact" in New York. In particular, defendants
say that plaintiff fails to allege that he worked in New York, and
instead mentions in his complaint that he was assigned at one point
to deal with a Connecticut client. (Id. at 8-9). According to
defendants, this failure of pleading and proof demonstrates that
the court lacks subject-matter jurisdiction over the claims
asserted under the NYSHRL and the NYCHRL. (Id. at 8-9 (citing
Hoffman v. Parade Pubs., 15 N.Y.3d 285, 907 N.Y.S.2d 145 (2010)).

     In response to the attack on the ADA claim, plaintiff argues
that he adequately pleads the existence of a single-employer
relationship, based inter alia on his allegations (1) that he was
hired by the CEO of the parent Project Brokers Ltd., (2) that he
had his request for a financial accommodation approved by the Chief
Financial Officer of that United Kingdom entity, and (3) that
plaintiff's New York supervisor repeatedly told him that he could
not reimburse plaintiff for claimed travel expenses without prior
approval of Radclyffe. (Pl.'s Mem. of L. in Opp'n to Defs.' Mot. to
Dismiss, dated Jan. 15, 2014 (Dkt. No. 18) ("Pl.'s Opp'n") at 13-
18). In addition, plaintiff proffers his own declaration and other
documentary evidence to demonstrate that there is a basis for
inferring that the United Kingdom entity and the United States-

8

based office functioned as a single employer. (Wexelberg Decl. ¶¶ 2-8, 12, 14-18, 20-25, 28, 41-43, 49-51; Cert. of Mitchell L. Pascual, Esq., dated Jan. 16, 2014 (Dkt. No. 18-1) ("Pascual Cert.") at ¶ 2, 4-5 & Exs. A & D). Since the United Kingdom office alone had 65 employees (id. Ex. C), such a finding would amply satisfy the ADA requirement of fifteen such employees. (Pl.'s Opp'n 13-18). Finally, plaintiff notes that he has as yet had no opportunity for pre-trial discovery, which would permit him to flesh out his evidentiary showing. (Id. at 12-14).

As for the State and City claims, plaintiff argues that the complaint adequately alleges that he worked in New York City at the Project Brokers office, a circumstance that triggers coverage by both statutes. (Id. at 18-21). In addition, he states under penalty of perjury that he in fact worked at the New York City office for six of the eleven weeks during which he was employed by defendants, and that, at defendants' direction, for the balance of that period he worked remotely from his New Jersey home for the New York office -- an instruction perhaps designed to spare defendants from having to reimburse him for travel expenses. (Wexelberg Decl. ¶¶ 29, 33-35, 44). Under these circumstances, he contends, he satisfies the "impact" requirement of those statutes. (Pl.'s Mem. 21).

9

On defendants' reply, they reiterate their contention that the complaint alleges no facts "to satisfy the single employer standard other than legal platitudes." (Defs.' Reply in Supp. of Mot. to Dismiss, dated Jan. 28, 2014 (Dkt. No. 19) ("Defs.' Reply") at 2). As for plaintiff's evidentiary proffer, they engage in an effort to demonstrate that the plaintiff's declaration is insufficient to save his claims -- characterizing plaintiff as resting jurisdiction on the fact that he was terminated in New York -- and argue further that plaintiff does not mention a host of facts potentially relevant to a "single employer" analysis. (Id. at 3-5) (discussing at length Guzman v. News Corp., 2013 WL 5807058 (S.D.N.Y Oct. 28, 2013)). Defendants further reiterate that plaintiff cannot satisfy the "impact" test for coverage by the State and City statutes, because he was working from his New Jersey home when he was terminated. (Id. at 5-7).

## ANALYSIS

Defendants offer a pair of two-prong arguments -- premised respectively on Rule 12(b) and Rule 56 analyses -- to challenge the viability of both the ADA and the State and City claims. We address each separately, starting with the federal claim.

10

## I. **The ADA Claim**

As noted, defendants first contend that plaintiff's pleading is inadequate to sustain a potential "single employer" theory, which would be necessary to satisfy the ADA requirement that the defendant have at least fifteen employees "in the current or preceding calendar year".[3] They also proffer evidence to show that plaintiff cannot demonstrate the requisite number of employees. We first consider their Rule 12(b)(6) assessment.

### A. **The Pleading Issue**

#### 1. **Rule 12(b)(6) Criteria**

We first note the limits of the required 12(b)(6) analysis. "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), abrogated on other grounds by Harlow v. Fitzgerald, 457 U.S. 800 (1982); accord,

---

[3]The failure to satisfy the fifteen-employee rule represents a failure on the merits rather than a lack of jurisdiction. See Arbaugh v. Y & H Corp., 546 U.S. 500, 510-15 (2006); DaSilva v. Kinsho Int'l Corp., 229 F.3d 358, 365-66 (2d Cir. 2000). Hence the applicable rule for assessing defendants' attack on the ADA claim is Rule 12(b)(6).

e.g., Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 476 (2d Cir. 2006). In assessing such a motion, the court must assume the truth of the well-pled factual allegations of the complaint and must draw all reasonable inferences against the movant. See, e.g., Achtman v. Kirby, McInerney & Squire, LLP, 464 F.3d 328, 337 (2d Cir. 2006); Still v. DeBuono, 101 F.3d 888, 891 (2d Cir. 1996). The pleader may not rely, however, on allegations that are only bare legal conclusions, see Starr v. Sony BMG Music Entm't, 592 F.3d 314, 317 n.1 (2d Cir. 2010) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679, (2009)), or "legal conclusions couched as factual allegations". Id. at 321 (quoting Port Dock & Stone Corp. v. Old Castle Northeast, Inc., 507 F.3d 117, 121 (2d Cir. 2007)).

The traditional test on a Rule 12(b)(6) motion required that the complaint not be dismissed "'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Leibowitz v. Cornell Univ., 445 F.3d 586, 590 (2d Cir. 2006) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). The Supreme Court has since rejected this formulation, however, and hence a complaint is now subject to dismissal unless its factual allegations, if credited, make the claim "plausible." See Iqbal, 556 U.S. at 678; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 560-61 (2007). The court thus must look to

12

the well-pled factual allegations and determine whether, if true, those allegations would permit a reasonable inference that the defendant is liable. See, e.g., Iqbal, 556 U.S. at 678. While this does not require a party to plead "'detailed factual allegations'" to survive a motion to dismiss, Starr, 592 F.3d at 321 (quoting Twombly, 550 U.S. at 555), it does require that "'the plaintiff plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Id. (quoting Iqbal, 556 U.S. at 678). Thus, "an unadorned, the-defendant-unlawfully-harmed-me accusation" will not suffice. Iqbal, 556 U.S. at 678. In short, the pleading must do more than "tender[] naked assertions devoid of further factual enhancement," id. (internal quotation marks omitted), and in doing so must "'raise a right to relief above the speculative level.'" ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (quoting Twombly, 550 U.S. at 555).

When addressing a 12(b)(6) motion, the court may not consider evidence proffered by the moving party or its opponent. Rather, the court is limited to reviewing the four corners of the complaint, any documents attached to that pleading or incorporated in it by reference, any documents that are "integral" to the plaintiff's allegations even if not explicitly incorporated by reference, and

13

facts of which the court may take judicial notice. See, e.g., ATSI
Commc'ns, Inc., 493 F.3d at 98; Roth v. Jennings, 489 F.3d 499, 509
(2d Cir. 2007); Leonard F. v. Israel Disc. Bank, 199 F.3d 99, 107
(2d Cir. 1999).

## 2. **Assessment of Defendants' Argument**

As noted, the only issue framed by defendants' attack on the
ADA allegations of the complaint is the viability of plaintiffs'
assertion that the United Kingdom-based Project Brokers Ltd. and
the New York office constituted a single employer for purposes of
determining whether defendant had the requisite number of
employees. In pressing their point, defendants assert that the
complaint fails because it is limited to conclusory legal
assertions about the relationship between the United Kingdom and
United States entities. This argument misreads the complaint, and
a more accurate assessment of that document makes clear that the
pleading itself is not legally insufficient.

We start with some basic principles underlying the concept of
a "single employer" in the context of a parent-subsidiary
relationship. "A single employer situation exists where two
nominally separate entities are actually part of a single

14

integrated enterprise. . . ." <u>Arculeo v. On-Site Sales & Marketing,</u> <u>LLC</u>, 425 F.3d 193, 198 (2d Cir. 2005) (quoting <u>Clinton's Ditch</u> <u>Coop. Co. v. NLRB</u>, 778 F.2d 132, 137 (2d Cir. 1985)). If the two entities are found to be a single employer, all of the employees of each entity would be deemed an employee of the "single employer".[4] <u>Id.</u> at 199.[5] In assessing whether two entities constitute a single employer, the courts typically apply a "flexible" four-factor test, which looks to

> evidence of (1) interrelationship of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control.

---

[4]The Second Circuit has not yet decided whether the single-employer concept applies in the context of the statutory requirement under the ADA and Title VII that the "employer" have at least fifteen employees. <u>See</u> <u>Arculeo</u>, 425 F.3d at 197-200. That said, the rationale for applying that theory in this circumstance is essentially the same as would compel its utilization in other contexts under these and similar statutes, and accordingly it is unsurprising that the district courts and other circuits have applied it when assessing whether a plaintiff satisfies the numerosity requirement for purposes of demonstrating statutory coverage of a defendant. <u>See</u>, <u>e.g.</u>, <u>id.</u> at 198 (citing cases); <u>Nesbit v. Gears Unlimited, Inc.</u>, 347 F.3d 72, 85-87 (3d Cir. 2003); <u>Shiflett v. Scores Holding Co.</u>, 2014 WL 1413618, at *3-6 (S.D.N.Y. Apr. 10, 2014).

[5]It is essential to distinguish a "single employer" from a "joint employer" because the latter circumstance justifies counting only the employees of the ostensible employer and those individuals in the other entity who are actually involved in the employment relationship that triggers a finding of joint employer, whereas a finding of single employer leads to counting all of the employees of the two entities. <u>See</u> <u>Arculeo</u>, 425 F.3d at 197-99.

Cook v. Arrowsmith Shelburne, Inc., 69 F.3d 1235, 1240-41 (2d Cir.
1995) (quoting and approving Garcia v. Elf Atochem North America,
28 F.3d 446, 450 (5th Cir. 1994)). The focus is on the "centralized
control of labor relations", id. at 1240-41, and even that
criterion may be satisfied "'by a showing that there is an amount
of participation [that] is sufficient and necessary to the total
employment process, even absent total control or ultimate authority
over hiring decisions.'" Id. at 1241 (quoting Armbruster v. Quinn,
711 F.2d 1332, 1338 (6th Cir. 1983)).


      In plaintiff's complaint he offers far more than pure legal
conclusions. He alleges that he negotiated his employment with
Radclyffe, the CEO of the British entity, who agreed to hire him.
This alone plausibly suggests that the parent maintained control of
employment decisions. He further relates that Radclyffe advised him
that his request for reimbursement of his travel expenses was a
matter that had to be decided by the Chief Financial Officer of the
British entity, and that this individual had approved his request.
This reinforces the suggestion of centralized employment control
and also supports the inference that the parent maintained control
of the finances of the United States company. In addition,
plaintiff reports that when he demanded payment of those expenses

                              16

from his immediate United States-based supervisor -- defendant Williams -- he was told that approval for those payments must come from the United Kingdom, specifically from Radclyffe. Again, this supports the inference of central fiscal control.

These allegations, by themselves, are certainly adequate to lend plausibility to plaintiff's assertion that the two entities functioned as an integrated unit. Apart from these specific statements in the complaint, however, plaintiff also proffers representations made by the United Kingdom-based parent on its website and in its printed materials that further reinforce the plausibility of plaintiff's contention about single-employer status. First, he offers a screen shot of the parent's website that shows the United Kingdom entity referring to itself as "a team" and urging interested viewers to "contact us", followed by a listing of how to contact the "team" -- a list that includes both its London office and its office at 14 Wall Street, in Manhattan. (Pascual Cert. Ex. A). Second, plaintiff includes written materials provided by BIPB -- the successor to Project Brokers Ltd. -- in which it refers to itself as a "global consultancy firm" (id. Ex. D at 4), lists itself as located at addresses in London, New York and other locales (id. Ex. D at 6-7), states that "we have offices worldwide" (id. Ex. D at 8) and offers personal sketches of "the team" that

17

include not only a senior consultant located in London, but two individuals (one a consultant and one identified as the "US operations manager") located in the United States and the Product Strategy Director, who is identified as being located in both the United Kingdom and United States. (Id. Ex. D at 14-17).

Although these items are not pled in the complaint, at the least the website material is subject to judicial notice and hence cognizable on a Rule 12(b)(6) motion. See, e.g., 23-34 94th St. Grocery Corp. v. New York City Bd. of Health, 685 F.3d 174, 183 & n.7 (2d Cir. 2012) (citing United States v. Akinrosotu, 637 F.3d 165, 168 (2d Cir. 2011)). These items amount to admissions by defendants and, in conjunction with the cited allegations in the complaint, they more than amply permit the ADA claim as pled to survive.⁶

---

⁶To the extent that defendants rely on the single-employer analysis in Guzman to support their dismissal motion, that reliance is misplaced. The Guzman court rejected the plaintiff's single-employer argument on a summary-judgment motion, not a Rule 12(b)(6) application, and plainly did so after completion of pertinent discovery. See Guzman, 2013 WL 5807058, at *1 & *2-7. See also St. Jean v. Orient-Express Hotels, Inc., 963 F. Supp.2d 301, 309 (S.D.N.Y. 2013) (distinguishing summary-judgment decisions from a 12(b)(6) motion).

18

## B. **Defendants' Rule 56 Motion**

Defendants' alternative application, for summary-judgment relief on the fifteen-employee question, is equally unfounded. Before addressing their argument, we briefly summarize the applicable Rule 56 standards.

### 1. **Summary-Judgment Criteria**

A court may enter summary judgment only if it concludes that there is no genuine dispute as to the material facts and that, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); see, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Shade v. Hous. Auth. of the City of New Haven, 251 F.3d 307, 314 (2d Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). It is axiomatic that the responsibility of the court in deciding a summary-judgment motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues

19

to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986); see, e.g., Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson, 477 U.S. at 255; Howley v. Town of Stratford, 217 F.3d 141, 150-51 (2d Cir. 2000).

The party moving for summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record, including "depositions, documents, electronically stored information, affidavits or declarations," that demonstrate the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(c)(1); see, e.g., Celotex, 477 U.S. at 322-23, 325; PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002); Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995). If the movant fails to meet its initial burden, the motion will fail even if the opponent does not submit any evidentiary materials to establish a genuine factual issue for trial. See, e.g., Adickes v. S.H. Kress & Co., 398 U.S. 144, 161 (1970); Giannullo v. City of N.Y., 322 F.3d 139, 140-41 (2d Cir. 2003).

Summary judgment should only be granted "[i]f after discovery, the nonmoving party has failed to make a sufficient showing on an

essential element of [its] case with respect to which [it] has the burden of proof." <u>Hellstrom v. U.S. Dep't of Veterans Affairs</u>, 201 F.3d 94, 97 (2d Cir. 2000) (quoting <u>Berger v. United States</u>, 87 F.3d 60, 65 (2d Cir. 1996)). "The nonmoving party must have 'had the opportunity to discover information that is essential to his opposition' to the motion for summary judgment." <u>Trebor Sportswear Co. v. The Limited Stores, Inc.</u>, 865 F.2d 506, 511 (2d Cir. 1989) (quoting <u>Anderson</u>, 477 U.S. at 250 n.5). "[O]nly in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery." <u>Hellstrom</u>, 201 F.3d at 97 (citations omitted).

### 2. <u>Assessment of the Rule 56 Motion</u>

In support of defendants' summary-judgment attack on the ADA claim, they offer a declaration by defendant Radclyffe, who briefly states that "Project Brokers [LLC] has always been a wholly owned subsidiary of BIPB Limited", as has another subsidiary (BIPB SaRL, a French company), and that "each of these corporate entities operates independently of the others with its own offices and employees." (Radclyffe Decl. ¶ 3). Radclyffe further states that Project Brokers LLC (the United States entity) had no more than four to seven employees who worked for it for at least twenty weeks

21

in 2010 or in 2011. (Id. at ¶ 4). Finally, he asserts that the American entity "was run by Defendant Misha Williams", but he goes on to say that "to the extent that Williams ever reported to the parent company, BIPB Limited, he reported to me (I was the parent company's Chief Operating Officer at the time)", as well as to BIPB's then CEO and CFO, none of whom were employees of Project Brokers LLP. (Id. at ¶ 5).

In response, plaintiff proffers his own declaration in which he recounts the pertinent events that are alluded to in the complaint. Thus he reports that in 2010 he negotiated a potential employment deal with Mr. Radclyffe, now the firm's CEO, and with a Ms. Katrina Collier, a representative of the British firm's human resources department, both of whom were located in the London office of Project Brokers. (Wexelberg Decl. ¶¶ 3-4). He notes further that although no agreement was reached at that time, in 2011 he again negotiated directly with Mr. Radclyffe and Ms. Collier by conference call, as well as with a Project Broker developer also based in the London office. (Id. at ¶¶ 5-8). He further reports that he had a follow-up interview with Mr. Radclyffe and Mr. Williams in the New York office. At that time he informed both of them of his disability and need for an accommodation -- including limiting him to New York clients and

22

reimbursing travel expenses -- and, according to plaintiff, Radclyffe responded that any reimbursement arrangement would "need to be approved by the Finance Department in Project Broker's London Office." (Id. at ¶¶ 12-15). Plaintiff further notes that Radclyffe later informed him that the London office had approved his reimbursement request. (Id. at ¶ 16 & Ex. A).

As plaintiff recounts, he was offered a position in the New York office as a QV consultant, and he accepted. As a preliminary matter he was required to, and did, attend "a company-wide meeting at [Project Broker's] London Office". (Id. at ¶ 20). At that meeting -- attended by employees from various of Project Brokers' satellite offices (including New York, Sao Paulo, and South Africa) -- the attendees were told of the company's "strategic plan and vision moving forward", which encompassed "a unified strategic plan involving all Project Brokers offices." (Id. at ¶¶ 21-23). He was also advised that he was to be given in-depth technical training in London, although this was never afforded him. (Id. at ¶¶ 24-26. See also id. at ¶ 28).

Plaintiff goes on to report that he periodically asked for the promised travel reimbursements from Williams, who told him that he needed approval from London to make the requested payments.

23

Moreover, when he complained to Williams about the failure to honor this accommodation, Williams told him that Radclyffe had not yet approved the disbursements. (Id. at ¶¶ 41-43).

Finally, plaintiff states that he was terminated for purportedly inadequate performance. Since he had been advised of this step by Williams, he complained to Radclyffe, who promised to investigate. According to plaintiff, Radclyffe later sent him an e-mail reiterating that he had been terminated for inadequate performance. (Id. at ¶¶ 45-51).

Putting to one side the fact that no discovery has yet taken place, plaintiff's own declaration is sufficient by itself to demonstrate triable issues with respect to whether the United Kingdom and United States entities may be treated as a single employer. Indeed, his account implicates all of the pertinent criteria for making such a "single employer" assessment, and his proffer of the previously described website page and other corporate materials circulated by BIPB only reinforces the notion that the question triggers, at the very least, a host of triable factual issues.[7]

---

[7] We note also that defendants' reliance on Guzman in support of their Rule 56 application is misguided, not only because no

24

Finally, as noted, no discovery has yet taken place. Many of the facts pertinent to the assessment of the relationship between the British and American entities are in the unique possession of the defendants, and it necessarily follows that even absent plaintiff's evidentiary showing, summary judgment at this stage would be unjustified. Fed. R. Civ. P. 56(d). See, e.g., Hellstrom, 201 F.3d at 97. See also Miller v. Wolfson & Abramson L.L.P., 321 F.3d 292, 303-04 (2d Cir. 2003).

## II. The NYSHRL and NYCHRL Claims

Defendants also seek dismissal or summary judgment on plaintiff's State and City claims. Their arguments are premised on the twin contentions that plaintiff fails to plead, and cannot prove, that their allegedly discriminatory actions had the requisite impact within the State and City, thus demonstrating a lack of subject-matter jurisdiction in this court. We conclude that their challenge to these claims falls short.

---

discovery has been conducted in this case, but because the facts in the earlier case were strikingly different -- including, most notably, the court's finding there that the parent had no centralized control over employment decisions regarding the plaintiff. See 2013 WL 5807058, at *9-10.

## A. **The Governing Standards**

The pertinent state statute, N.Y. Exec. L. §§ 296[1](a), prohibits employers <u>inter</u> <u>alia</u> from discriminating against employees on the basis of disability, and further requires the employer, on appropriate request, to make reasonable accommodations available to a disabled person to permit him to perform his job responsibilities. <u>See</u> <u>Jacobsen v. New York City Health & Hosps.</u> <u>Corp.</u>, 2014 WL 1237421, at p. 10 (Mar. 27, 2014); <u>Romanello v.</u> <u>Intesa Sanpaolo S.p.A.</u>, 22 N.Y.3d 881, 883-85, 976 N.Y.S.2d 426, 426-28 (2013). The State statute also prohibits the employer from retaliating against a disabled employee for complaining about a violation of his rights under the statute. N.Y. Exec. L. § 296[1](e). <u>See</u>, <u>e.g.</u>, <u>DeMarzo v. Urban Dove, Inc.</u>, 41 Misc.3d 1209(A), 2013 WL 5526047, at *1 (Sup. Ct. Kings Cty. Oct. 1, 2013). The NYCHRL has parallel provisions barring discrimination and retaliation against disabled employees. NYC Admin. Code §§ 8-107(1)(a) & (e). <u>See</u>, <u>e.g.</u>, <u>Jacobsen</u>, 2014 WL 1237421, at p. 10; <u>Demarzo</u>, 2013 WL 5526047, at *1.[8]

---

[8] One distinction between the two statutes is that under the State law it is the plaintiff's burden to demonstrate the availability of a reasonable accommodation, while under the City law the defendant has the burden to demonstrate the unavailability of such an accommodation. <u>See</u> <u>Jacobsen</u>, 2014 WL 1237421, at pp. 10-11.

Although neither statute directly defines the geographic scope of its coverage, the New York Court of Appeals has offered some clarification in the context of an employee who is not domiciled in New York. In Hoffman v. Parade Publications, the Court addressed the circumstance of an employee who worked at the defendant's Atlanta office, but who alleged that he had been discriminatorily terminated pursuant to a decision made at corporate headquarters in New York City. Interpreting both the State and City statutes, the Court held that to qualify for coverage, a plaintiff living outside New York must both plead and prove that the discriminatory or otherwise wrongful conduct had an impact within New York State (for State law coverage) and an impact within the City (for City coverage). 15 N.Y.3d at 290-91, 907 N.Y.S.2d at 147-48.[9] In offering guidance on the nature of the necessary impact, the Court held that if the employee works within the City or State, he will be deemed statutorily covered by the pertinent provision, but if he works elsewhere, he cannot satisfy the impact test based solely on the contention that the discriminatory decision was made within the jurisdiction. Id. at 290-91, 907 N.Y.S.2d at 147-48. Accord, e.g.,

---

[9] As the Hoffman Court noted, the New York State Executive Law does contain provisions that protect an employee who resides here from certain discriminatory conduct by an employer even if that conduct occurs outside New York. Id. at 291, 907 N.Y.S.2d at 149 (discussing N.Y. Exec. L. § 298-a[1]).

27

Hardick v. Aurimma, __ N.Y.S.2d __, 2014 WL 1356797, at *2 (1st Dep't Apr. 8, 2014). Although the panel did not explicitly go further than to say that a person who worked in New York would be covered -- it alluded to Hoffman having alleged only "that his employment had a tangential connection to the city and state", Hoffman, 15 N.Y.3d at 291, 907 N.Y.S.2d at 149 -- it appears from the dissent that the Court was effectively holding that frequent interstate communications with the New York office and occasional meetings in New York, including a discussion there about the employee's job status, would also be insufficient to trigger coverage. See id. at 293, 296, 907 N.Y.S.2d at 149, 152 (Jones, J., dissenting).

Indeed, we assume for present purposes that Hoffman is properly read to say that the impact test means that an out-of-state resident may be covered only if he worked in the State and (as pertinent) in the City. In this regard the Court noted that it was seeking to make the State and City statutes "simple for courts to apply and litigants to follow, leading to predictable results". Id. at 291, 907 N.Y.S.2d at 148. Hence it appeared to read the statutory coverage as limited "to those who are meant to be protected -- those who work in the city [or the state]." Id.

28

As simple as this formulation may seem, however, it does not necessarily lend itself to simple application in all contexts; as is true in so many instances when courts apply specifically-worded legal principles, there are circumstances that may be classified as falling in a grey area. This is one of them.

Since the alleged failing by plaintiff that is cited by defendants is one that would, according to the New York Court of Appeals, trigger an absence of subject-matter jurisdiction, id. at 289, 907 N.Y.S.2d at 146-47 (characterizing issue, as ruled on below, to be one of jurisdiction); see id. at 293, 907 N.Y.S.2d at 149 (Jones, J,. dissenting) (same), we may look both to the pleadings and to evidentiary materials proffered by the parties. See, e.g., M.E.S., Inc. v. Snell, 712 F.3d 666, 670 (2d Cir. 2013) (citing cases). Both the complaint and plaintiff's declaration make clear that plaintiff initially worked for defendants in New York City, specifically, at the office of the defendants in Manhattan. (Am. Compl. ¶ 24; Wexelberg Decl. ¶¶ 3, 19, 29). Moreover, in plaintiff's declaration he reports that he worked there for the first six weeks of his eleven-week stint with defendants, and that he was then directed to work remotely from his home in New Jersey, a period that apparently lasted only five weeks, until his ultimate termination. (Id. at ¶¶ 33, 44). He also notes that defendants

29

consistently treated him as an employee in their New York office, as they withheld a portion of his pay to account for New York State income taxes. (Id. at ¶ 53 & Ex. B).

This set of circumstances lends itself to several plausible arguments for statutory coverage. First, it appears that while plaintiff was physically working full-time in the New York office, he was asking for, and being denied, reimbursement for his travel expenses. This refusal to pay those expenses is a basis for his claim that defendants discriminated against him by denying him his promised reasonable accommodation for his disability. Hence, that violation appears to have occurred while he was working in the City, thus triggering coverage by both the State and City statutes.

Second, though the question presented on plaintiff's termination claim is a closer one, it may turn on factual matters not yet explored by either side in discovery or in their motion papers, and it will also depend on legal issues not briefed by either side. In Hoffman and cases that have followed it, there was no question that the plaintiff was working throughout the relevant time at a work site of his employer or its client that was outside the City and sometimes the State. E.g., Shah v. Wilco Sys., Inc., 27 A.D.3d 169, 176, 806 N.Y.S.2d 553, 558 (1st Dep't 2003) (New Jersey plaintiff

30

worked at client sites in New Jersey; NYCHRL inapplicable); Fried
v. LVI Servs., Inc., 500 Fed. App'x. 39, 42 (2d Cir. 2012)
(Connecticut plaintiff worked at employer's office in Connecticut;
NYCHRL inapplicable); Kearse v. ATC Healthcare Servs., 2013 WL
1496951, at *2 (S.D.N.Y. Apr. 8, 2013) (plaintiff worked at Long
Island facility; NYCHRL inapplicable); Welch v. United Parcel
Serv., 871 F. Supp.2d 164, 178-81 (E.D.N.Y. 2012) (plaintiff worked
at defendant's facility outside New York City; hence NYCHRL is
inapplicable); Robles v. Cox & Co., 841 F. Supp.2d 615, 623-25
(E.D.N.Y. 2012) (same). That is not the case here. As noted, for
the majority of the relevant time the plaintiff was working at
defendants' work site in New York City. It is not clear from
Hoffman or its progeny that in such a circumstance the plaintiff
may not be deemed to have been working in the City for purposes of
all of his claims. Cf. Chin v. CH2M Hill Cos., 2012 WL 4473295, at
*3-4 (S.D.N.Y. Sept. 28, 2012) (reading Hoffman as potentially
applying to employee who did some work in the defendant's New York
office).


Furthermore, during the five weeks when plaintiff was not
physically located in the New York office, he was working remotely
from his home for the New York office rather than working at an
out-of-state office of the the defendants or at a client site.

31

Depending on the details as to what such remote work entailed, this arrangement may present quite a different scenario from the caselaw that addresses a claim by an employee stationed at an out-of-state office.

Finally, we note that ignoring these considerations in this case and looking only to where the plaintiff was located just before he was terminated (as defendants seem to do) could create a major loophole in the statutory protection that the Court of Appeals envisaged for employees residing out-of-state but working in New York. By the simple stratagem of directing a targeted employee to do his work at home rather than at the New York office where he normally works, and then terminating him a few days or weeks later, the employer would immunize itself from liability under both State and City statutes. It can scarcely be the case that the State Legislature intended to allow this form of victimization of the very employees whom the Court of Appeals deemed "those who are meant to be protected". Hoffman, 15 N.Y.3d at 291, 907 N.Y.S.2d 148.

In sum, we conclude that plaintiff has made an adequate showing at this preliminary stage that he was an employee working in New York City and State for purposes of coverage under the

NYSHRL and the NYCHRL. Accordingly, this aspect of defendants'
motion to dismiss should be denied.

## CONCLUSION

For the reasons stated, we recommend that defendants' motion
to dismiss the complaint or to grant them summary judgment should
be denied.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure,
the parties shall have fourteen (14) days from this date to file
written objections to this Report and Recommendation. Such
objections shall be filed with the Clerk of the Court and served on
all adversaries, with extra copies to be delivered to the chambers
of the Honorable Lewis A. Kaplan, Room 2240, 500 Pearl Street, New
York, New York 10007-1312 and to the chambers of the undersigned,
Room 1670, 500 Pearl Street, New York, New York 10007-1312. Failure
to file timely objections may constitute a waiver of those
objections both in the District Court and on later appeal to the
United States Court of Appeals. See Thomas v. Arn, 474 U.S. 140,
150 (1985), reh'g denied, 474 U.S. 1111 (1986); Small v. Sec'y of
Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); 28 U.S.C. §
636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

33

Dated: New York, New York
       April 28, 2014


                                    MICHAEL H. DOLINGER
                                    UNITED STATES MAGISTRATE JUDGE



Copies of this Report & Recommendation have been sent today to:

Mitchell L. Pascual, Esq.
Amanda E. Jackson, Esq.
Joseph E. Santanasto, Esq.
Chasan Leyner & Lamparello, PC
300 Harmon Meadow Boulevard
Secaucus, NJ 07094

Steven I. Locke, Esq.
Law Offices of Steven I. Locke PC
85 Third Avenue, 5th Floor
New York, NY 10003